# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF GEORGIA
## VALDOSTA DIVISION

| | | |
|---|---|---|
| **CHRISTIAN WILLIS,** | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Civil Action No. 7:05-cv-59 (HL) |
| | : | |
| **GEORGIA DEPARTMENT OF** | : | |
| **JUVENILE JUSTICE, et al.,** | : | |
| | : | |
| Defendants. | : | |
| _____ | : | |

# ORDER

Before the Court are a Motion for Summary Judgment filed by Defendants Georgia Department of Juvenile Justice and Commissioner Albert Murray (Doc. 26) and a Motion for Summary Judgment filed by Defendants Lowndes Drug Action Council and Rhonda Bullard (Doc. 29.) For the reasons set forth below, the Motions are GRANTED and the claims against these defendants are DISMISSED.

## I. BACKGROUND

The Lowndes Drug Action Council ("LODAC") is a non-profit organization that provides social services to the troubled youth of Valdosta, Georgia. (Flemming Aff. ¶ 3.) A private board of directors governs LODAC, and the organization operates independently of

any governmental entity.  (Flemming Aff. ¶ 5.)  Although it has in the past accepted referrals from the Lowndes County Juvenile Court, it is under no obligation to do so.  (Flemming Aff. ¶ 9.)  LODAC is free to reject referrals from the court at its discretion.  (Flemming Aff. ¶ 9.)  In 2002, only one percent of its referrals came from the Lowndes County Juvenile Court; other courts, teachers, counselors, parents, and schools made the remaining ninety-nine percent of the referrals to the program.  (Flemming Aff. ¶ 10.)

In early 2002, the Lowndes County Juvenile Court ordered Plaintiff Christian Willis to attend LODAC's social skills program as part of a probationary sentence for a school fight. (Willis Aff. ¶ 5; Kelly Aff. ¶ 4)  On March 19, 2002, after six days of attending the class, LODAC dismissed her from the program. (Kelly Aff. ¶ 10; LODAC's Statement of Material Facts 3.)  LODAC cited her repeated tardiness as the reason for the dismissal, although Plaintiff's mother contends that Plaintiff was not repeatedly late.  (Kelly Aff. ¶ 10; Willis Aff. ¶ 7.)

LODAC employee Rhonda Bullard (now Rhonda Kelly) claims that on March 20, 2002, she informed Plaintiff's probation officer Pansy Long of Plaintiff's dismissal from the program and filled out a written notice of dismissal on April 19, 2002.  (Kelly Aff. ¶ 11.)  According to Plaintiff, on May 2, 2002, Judge Ellerbee ordered her to attend a second social skills program at LODAC.  (Willis Aff. ¶ 10.)  While Plaintiff was waiting for the start date of the second program, the court required her to attend the Odyssey Program at Southside Recreation Center.  (Willis Aff. ¶ 10.)

LODAC mailed a letter to Plaintiff's mother on or about June 3, 2002 to inform her

that classes would begin June 10, 2002. (Willis Aff. ¶ 11; Kelly Aff. ¶ 13.) Plaintiff asserts that it was mailed to the wrong address and that she did not attend the class because she never received the notice. (Willis Aff. ¶¶ 11-12, 15.) Bullard notified Long of Plaintiff's failure to attend class. (Kelly Aff. ¶ 15.) As a result, a warrant was issued for Plaintiff's arrest, which was executed on June 14, 2002. (Willis Aff. ¶ 17.)

That day, Officer Welch from the Lowndes County Sheriff's Department arrived at Plaintiff's home to arrest her for violation of her probation. (Willis Aff. ¶ 17.) The Officer transported her to Loftiss Regional Youth Detention Center in Thomasville, Georgia. (Willis Aff. ¶ 17.) At the Detention Center, a member of the Detention Center Admissions Team conducted a strip search and vaginal examination as part of their admissions routine. (Willis Aff. ¶ 17.) Plaintiff alleges that the Admissions Team conducted the search without probable cause to believe she possessed any contraband. (Compl. ¶ 37.)

## II. PLAINTIFF'S CLAIMS

The Court notes at the outset that Plaintiff's complaint is not an example of clarity. In most counts she does not indicate the claim under which she seeks relief, and there are numerous instances of what appears to be sloppy "cutting and pasting" from other documents. What follows is this Court's best efforts to identify her claims using the information provided in the Complaint and the assumptions the parties have made during the summary judgment proceedings.

Paragraphs thirty and thirty-one apparently constitute Count One of the Complaint.

Although they are not labeled as such, these paragraphs come before Count Two, and they pray for relief. They allege that Rhonda Bullard, "Lowndes County,"[1] and Pansy Long (who was dismissed from the lawsuit by court order on May 5, 2006) failed to "take adequate precautions in the hiring, promotion, and retention of police personnel," report incidents of criminal misconduct by the police to the District Attorney, and establish a meaningful departmental system for dealing with complaints of police misconduct. They also state that these parties failed to "properly discipline, restrict, and control employees," including Lowndes County, Pansy Long, and Rhonda Bullard.

The Court assumes that this is a claim under 42 U.S.C. § 1983, although it does not assert a specific claim, nor does it identify the federal right that was allegedly violated. Even making that assumption, however, the allegations appear to be poorly paired with the facts in this case. Defendant LODAC's brief speculates that these allegations were "improperly copied from a complaint in another case since the present case does not involve police misconduct, police personnel or the District Attorney." (LODAC Mot. Summ. J. 7.) Because Plaintiff does not contest LODAC's conclusion that this section was improperly copied, the Court concludes that Plaintiff is no longer pursuing these claims against LODAC. To the extent that Count One is a claim under § 1983 for monetary relief against the Department of Juvenile Justice ("the Department") and Commissioner Murray, it is treated

---

[1] The Court assumes that Plaintiff intended to make these claims against the Lowndes County Department of Juvenile Justice instead of Lowndes County itself, which is not a named party to the lawsuit.

below.

Count Two seeks relief from all defendants for intentional infliction of emotional distress. While this would otherwise plainly appear to be a claim for relief under state law, Plaintiff seeks damages under 42 U.S.C. § 1988, which is a federal statute that grants attorney's fees in select civil rights actions. 42 U.S.C.A. § 1988(b) (West 2003). No attorney's fees would be available under this statute for a successful state law claim. See id. The Court therefore concludes that the request for attorney's fees was improperly copied.

Count Three asserts that Plaintiff's strip search violated a number of her constitutional rights. It requests that the Court declare the Plaintiff's strip search invalid and seeks an injunction against future strip searching unless there is probable cause to believe the detainee has concealed contraband or weapons. Count Three does not specify to which defendants it refers. Because there is no allegation that LODAC performed the strip search, we presume the injunction is sought against the Department of Juvenile Justice and Commissioner Murray.

Count Four alleges that Plaintiff was "falsely accused and arrested without probable cause" and demands relief from all Defendants. (Compl. ¶ 34.) Again, there is no mention of the specific cause of action she asserts. Conceivably, she may make this claim under O.C.G.A. § 51-7-1, which provides a state law right of action for false arrest. O.C.G.A. § 51-7-1 (2000). She may also be making a claim under § 1983 by asserting that her arrest violated her Fourth and Fourteenth Amendment rights to be free of unreasonable searches and seizures. See U.S. Const. amend. IV; id. amend. XIV. Defendant LODAC treats both

possibilities, and Plaintiff's Response to LODAC's Motion for Summary Judgment provides no indication of which claim she is making. The Court therefore assumes she is making both state and federal claims under Count Four.

Count Five accuses LODAC of negligence and requests damages from all defendants. Like Count Two, an action for negligence lies under state law, not federal law. Nonetheless, Plaintiff again seeks relief under 42 U.S.C. § 1988. She also asks for punitive damages, although it is clearly established law that punitive damages are not available in claims for negligence. See, e.g., Colonial Pipeline Co. v. Brown, 258 Ga. 115, 118 (1988). The Court therefore concludes that both the request for punitive damages and attorney's fees under § 1988 were inadvertently included in Count Five.

Count Six seeks relief from all defendants for malicious abuse of process. The parties' arguments on Summary Judgment clarify that Plaintiff makes this claim under O.C.G.A. § 51-7-40. (Pl.'s Resp. LODAC's Mot. Summ. J. 10.) Again, the Court concludes that Plaintiff erroneously included a claim for attorney's fees under § 1988 in this Count. Finally, Count Seven alleges that all the defendants participated in a conspiracy in violation of 42 U.S.C. § 1985.

## III. ANALYSIS

Summary judgment is appropriate when there is no dispute of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The non-movant must point to a genuine factual dispute, not just a "metaphysical doubt." Matsushita

Elec. Indus. Co. v. Zenitsh Radio Corp., 475 U.S. 574, 586 (1986). On a motion for summary judgment, the movant has the initial burden to demonstrate that the non-movant lacks evidence to support an essential element of its claim. Lowe v. Aldridge, 958 F.2d 1565, 1569 (11th Cir. 1992). The burden then shifts to the non-movant, who must come forward with some evidence that would allow a jury to find in his favor, even if that evidence is disputed. Id. The court takes the facts in the light most favorable to the nonmoving party when ruling on a Motion for Summary Judgment. Stanley v. City of Dalton, 219 F.3d 1280, 1287 (11th Cir. 2000).

A.      **Claims Against the Georgia Department of Juvenile Justice for Monetary Relief**

Plaintiff seeks monetary relief under 42 U.S.C. § 1983 and § 1985 from the Department. The Department, however, asserts that its Eleventh Amendment immunity protects it from suit in federal court. In response, Plaintiff argues that Summary Judgment is inappropriate because the Department has the burden to establish that it is an arm of the state protected by the Eleventh Amendment, and it has not done so in this case because it presents "no analysis" on this issue.

Although the Department's half-page immunity analysis is far from extensive or sophisticated, the Department nonetheless meets its burden on summary judgment to point to an absence of material fact with regard to its status as a state agency. The Georgia Code clearly establishes that the Department is an arm of the state, and Plaintiff points to no authority that would suggest otherwise. Summary judgment on the issue of the Department's immunity is therefore appropriate.

*1. Standard*

The Eleventh Amendment protects states from suits brought in federal court without their consent. <u>Manders v. Lee</u>, 338 F.3d 1304, 1308 (11th Cir. 2003). It bars suits against states and their agencies for both prospective and injunctive relief. <u>R.R. Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.</u>, 506 U.S. 139, 146 (1993). Four factors determine whether an agency is an arm of the state for purposes of the Eleventh Amendment: how state law defines the agency, where the state law vests control of the agency, how the agency is funded, and whether the state is liable for payment of adverse judgments. <u>Manders</u>, 338 F.3d at 1309; <u>Miccosukee Tribe of Indians of Fla. v. Fla. State Athletic Comm'n</u>, 226 F.3d 1226, 1231-34 (11th Cir. 2000); <u>Shands Teaching Hosp. & Clinics, Inc. v. Beech St. Corp.</u>, 208 F.3d 1308, 1311 (11th Cir. 2000); <u>see also</u> <u>Hess v. Port Auth. Trans-Hudson Corp.</u>, 513 U.S. 30 (1994) (noting that the impetus for the Eleventh Amendment was protection of the state treasuries from federal-court judgments).[2]

The relevant question is not whether the Department acts as the State for all purposes; instead, this Court must decide only whether the Department is an arm of the State in executing its duties relevant in this case, i.e., the detention of youth and the administration of probation programs. <u>See, e.g.</u>, <u>Manders</u>, 338 F.3d at 1319. A discussion of Georgia law is therefore necessary to determine whether the Department is acting as the State in this case.

---

[2]Plaintiff cites several older cases from sister circuits that identify other factors as relevant to the analysis. <u>See</u> <u>Blake v. Kline</u>, 612 F.2d 718 (3rd Cir. 1979); <u>Laje v. R.E. Thompson Gen. Hosp.</u>, 665 F.2d 724 (5th Cir. 1982); <u>Unified Sch. Dist. No. 480 v. Epperson</u>, 582 F.2d 1118 (10th Cir. 1978). The Eleventh Circuit, however, has clearly outlined the test for Eleventh Amendment immunity, and the Court is therefore bound by its precedent.

*2. Georgia Law*

In 1963, the Children and Youth Act created the Department of Juvenile Justice. Ga. L. 1963, p. 81 § 1.[3] The Department is the "exclusive state agency" for developing and administering a "comprehensive state plan and program" for child welfare and youth services. O.C.G.A. § 49-5-7 (2006). It administers all state funds for child welfare and youth services. Id. § 49-4A7(a)(4). The agency is funded from state appropriations and federal appropriations to the State. Id. § 49-4A-7(c). The Code specifically absolves counties from bearing any cost of providing child welfare benefits, services, or program administration. Id.

The Board of Juvenile Justice ("The Board") develops the Department's general policies. Id. § 49-4A-2(a)(1). The Board is comprised so as to ensure a statewide representation among its fifteen members: each congressional district must be represented and no district may have more than two members on the Board. Id. The Governor appoints the members and the state Senate must confirm them. Id. The Board is responsible for establishing the rules and regulations regarding "the government, operation, and maintenance of all training schools, facilities, and institutions . . . under the control of the department." Id. § 49-4A-2(d). The Commissioner acts as the chief administrative officer of the Department. Id. § 49-4A-3(a). With the Governor's consent, he is subject to appointment and removal by

---

[3]Although the original name of the Department was the Department of Children and Youth Services, it was changed in 1997 to the Department of Juvenile Justice. O.C.G.A. § 49-4A-3(a) (2006). That change, however, was one of name only. Id.

the Board.  Id.  He administers the Department and executes the policy that the Board implements.  Id.

The Department must "provide for supervision, detention, and rehabilitation of juvenile delinquents committed to the state's custody."  Id. § 49-4A-3(b).  It supervises and manages the juvenile detention facilities that it maintains for this purpose.  Id. § 49-4A-4. The Board has the power to develop rules and regulations that govern the operation of these facilities.  Id. § 49-4A-6.  Georgia law gives the Department the power to accept children into its facilities and provide probation and parole services to them.  Id. § 49-4A-7(a)(1)-(2).

County or district departments exist to aid the Department in the local administration of the statewide plan.  Id. § 49-5-7(b). These local branches are subject to the control of the Department and must operate in accordance with the rules and regulations that the Board establishes.  Id.

### 3. "Arm of the State" Analysis

All four factors indicate that the Department acts an arm of the State with regard to the detention and probation of youthful offenders such as Plaintiff.  Georgia law explicitly defines it as a state agency responsible for developing and administering a statewide program. The funding comes from the State (and federal grants to the State), and local governments have no responsibility for the Department's budget or for funding the detention or parole programs that the Department administers.

In addition, control of the Department is not vested in local governments but in the State.  The Governor and state Senate choose the members of the Board, who are selected

from each voting district. In turn, this statewide Board and the Governor jointly control the hiring and firing of the Commissioner. Rules, regulations, and policies for detention and parole programs are determined at a statewide level and enforced by the Commissioner. There is no provision allowing the county to exercise control over these duties.

Although the Georgia Code is silent on the issue of where the financial burden of an adverse judgment will fall, it falls on the State. The Georgia Code's explicit absolution of any financial burden on the local government and the provision of funding from the State's coffers means that the State bears direct responsibility for a monetary judgment against the Department.

With all four factors weighing in favor of the Defendant Department, this case presents a clear example of an agency that is an arm of the State. Because the Department is a state agency, all claims against it–both for damages and injunctive relief–must be dismissed. In addition, all monetary claims against the Commissioner are dismissed. Although Plaintiff's Complaint appeared to make claims for monetary relief against Commissioner Murray, on Summary Judgment she concedes that his immunity protects him from these claims. (Pl's Resp. to Dep't Mot. Summ. J. 3) ("Plaintiff . . . has rightfully noted that [her] official capacity claims are pursued 'only for propective injunctive relief.' ").

## B.    Injunctive Relief

The Eleventh Amendment protects states from suits seeking either injunctive relief or damages. Metcalf & Eddy, Inc., 506 U.S. at 146. Under the doctrine of Ex Parte Young,

however, there is a narrow exception to Eleventh Amendment immunity: state officials are subject to suits seeking injunctive relief. Metcalf & Eddy, Inc., 506 U.S. at 146. Commissioner Murray is therefore not immune from the claim in Count Three, which seeks an injunction against future strip searches in cases where the offender is charged with a misdemeanor unless there is probable cause to believe the person has concealed contraband or weapons. However, Plaintiff lacks standing to raise the issue.

Although none of the parties raise the issue of standing, it is part of the constitutional requirement for an Article III case and controversy and this Court may raise it sua sponte. Bishchoff v. Osceola County, 222 F.3d 874, 877-78 (11th Cir. 2000). The party invoking federal jurisdiction bears the burden of proving she has standing. Bischoff, 22 F.3d at 878. At a minimum, a plaintiff seeking injunctive relief must show that she has suffered or is in immediate danger of suffering a real, direct injury. City of Los Angeles v. Lyons, 461 U.S. 95, 101 (1983). The injury must be more than hypothetical or conjectural. Id. A past constitutional injury is not enough to establish standing; it must be accompanied by a present and continuing threat of repeated injury. Id. at 102.

Lyons illustrates the standing problem that arises when a party seeks an injunction for a past constitutional violation. 461 U.S. at 105-06. The district court in that case found that the city authorized police officers to routinely apply unconstitutional choke holds, and failed to train officers regarding the proper use of force. Id. at 99. Nonetheless, the Supreme Court of the United States found that the plaintiff, who had received a choke hold during a routine traffic stop, lacked standing. Id. at 105. It reasoned that "past wrongs do not in themselves

amount to that real and immediate threat of injury necessary to make out a case or controversy." Id. at 103. In order to establish standing, therefore, the plaintiff in Lyons would have had to allege that he would be subject to another encounter with the police. Id. at 105-06.

The United States Court of Appeals for the Eleventh Circuit recently addressed a similar case in which the plaintiffs challenged the Sheriff's practice of conducting strip searches of all male arrestees booked in the jail, regardless of the crime for which they were arrested and without individualized findings of reasonable suspicion. Powell v. Barrett, No. 05-16734, slip op. at 6-7, available at 2007 WL 2386610 (11th Cir. Aug. 23, 2007). The court summarily dismissed the claim for injunctive relief because the plaintiffs lacked standing, holding that the threat that the plaintiffs would be subject to an unconstitutional strip search in the future was "too speculative or conjectural and not real and immediate." Id. at 30-31 n.27.

In the present case Plaintiff has failed to establish she meets the constitutional requirements for standing. Although she allegedly suffered an unconstitutional search in the past, there is no suggestion that she will be subjected to an unconstitutional search in the future. This is not to say that it could not occur, but the possibility is speculative. Plaintiff has neither alleged nor presented evidence that there is a real danger that Defendants will again act negligently and cause her to be arrested and strip searched. Because she faces no real, immediate threat of being strip searched in the future, Plaintiff has no standing to challenge the constitutionality of the search. Her claims for injunctive relief are therefore

dismissed.

**C.    Section 1983 Claims Against LODAC and Rhonda Bullard**

To obtain relief under § 1983, Plaintiff must show (1) that the appellees deprived her of a right secured under federal law and (2) the deprivation was accomplished "under color of" state law.  Willis v. Univ. Health Servs., Inc., 993 F.2d 837, 840 (11th Cir. 1993).  The Fourteenth Amendment provides no protection against purely private conduct.  Shelley v. Kraemer, 334 U.S. 1, 13 (1948).  Requiring that private-party defendants in § 1983 suits acted under color of law ensures that constitutional standards are applied to private parties only when it is fair to say that the State is responsible for the complained of conduct.   Blum v. Yartskey, 457 U.S. 991, 1004 (1982).  If a private party defendant did not act under color of law then no claim under § 1983 lies.  Rayburn ex rel. Rayburn v. Hogue, 241 F.3d 1341, 1347 (11th Cir. 2001).  The threshold question is therefore whether LODAC's conduct may be fairly attributed to the State.  Rendell-Baker v. Kohn, 457 U.S. 830, 838 (1982).

*1. Tarkanian Test*

Typically the question of whether a private party is a state actor[4] arises when the private party has taken the "decisive step" that deprives the plaintiff of his rights, Nat'l Collegiate Athletic Ass'n v. Tarkanian, 499 U.S. 179, 192 (1988), and the issue becomes

---

[4]In a § 1983 suit against a state official or a private party, the "state action" and "under color of" state law requirements are identical.  Lugar v. Edmonson Oil Co., 457 U.S. 922, 928 n.8 (1982).

whether the private action can be fairly attributed to the State. <u>Rendell-Baker</u>, 457 U.S. at 838; <u>Nat'l Broad. Co. v. Commc'n Workers of Am.</u>, 860 F.2d 1022, 1025 (11th Cir. 1988). The Supreme Court has developed three tests to address this situation: (1) the public function test, (2) the nexus / joint action test, and (3) the state compulsion test. <u>Willis</u>, 993 F.2d at 840.

This case, however, presents the "mirror image" of the typical scenario: the *state actor*, not the private party, took the decisive step that caused the deprivation of Plaintiff's rights. The Department–a state actor–conducted the strip search that violated Plaintiff's constitutional rights. That action can unquestionably be attributed to the State. LODAC's failure to notify Plaintiff of the upcoming class and its subsequent report to her parole officer simply set in motion a series of events that led to the strip search. The Court addressed this mirror-image scenario in <u>Tarkanian</u>. To apply its analysis to the case at bar requires a somewhat in-depth discussion of <u>Tarkanian</u>.

(a) Standard

In <u>Tarkanian</u>, after an investigation into allegations of rules violations at the University of Nevada at Las Vegas ("UNLV"), the National Collegiate Athletic Association ("NCAA") recommended that the University suspend tenured professor and coach Tarkanian from its athletic program. <u>Id.</u> at 186. UNLV adopted the NCAA's recommended sanctions, including Tarkanian's suspension. <u>Id.</u> at 187. Tarkanian sued both UNLV and the NCAA under § 1983. <u>Id.</u> at 187-88.

Because the NCAA was a private entity, determining whether it was a state actor under those circumstances was a threshold issue for liability under § 1983. <u>Id.</u> at 190. The Court

noted at the outset that this case was different from the typical state-action case:

> In the typical case raising a state-action issue, a private party has taken the decisive step that caused the harm to the plaintiff, and the question is whether the State was sufficiently involved to treat that decisive conduct as state action. . . .This case uniquely mirrors the traditional state-action case. Here the final act challenged by Tarkanian–his suspension–was committed by [the state actor] UNLV.

Id. at 192. The issue in the case was therefore slightly different than previous state-action cases. In prior cases the issue was whether the state participated in the private party's conduct enough to hold the state responsible for actions it did not actually take. Id. at 192 & n. 12. In contrast, Tarkanian presented the question of whether a private party's conduct is state action when it creates rules and regulations that would require the state to act in violation of an individual's rights, but it is the state that ultimately acts on those rules and regulations. Id. at 193.

The Court examined the role that UNLV played in making the NCAA rules that Tarkanian violated. Id. It found that although UNLV was one of many members of the NCAA who participated in the promulgation of rules, this was not sufficient to make the NCAA a state actor. Id. The Court further held that the State did not transform the NCAA into a state actor by embracing its rules and regulations. Id. at 194-95. UNLV did not delegate its state powers to the NCAA because UNLV always retained the power to withdraw from the NCAA and refuse to abide by its rules. Id. Finally the Court addressed arguments for the public function and joint participants tests. It rejected the idea that "fostering amateur athletics at the college level" was exclusively a state function. Id. at 197 n.18. Likewise, it

reasoned that UNLV and the NCAA were not joint participants because they maintained an adversarial relationship throughout the process.  Id. at 196 n.16.

(b) Analysis

The facts in this case bear a strong resemblance to the facts in Tarkanian.  In both cases it was the state and not the private actor that committed the allegedly unconstitutional act.  In addition, both private entities in these cases provided the impetus for the states to act.  UNLV complied with the NCAA's rules and its determination that Tarkanian violated them when it suspended Coach Tarkanian.  Likewise, the Department in effect adopted LODAC's rules and its determination that Plaintiff violated them when it sought the arrest warrant based on LODAC's information.  In both cases, the states' reliance on and adoption of a private party's actions are not sufficient to make that private party a state actor.  Although these state entities acted in compliance with private parties when they allegedly violated the plaintiffs' rights, that does not transform private parties' actions into actions of the state.

The facts in this case actually present a weaker argument for state action than those in Tarkanian.  In contrast with UNLV's involvement in the NCAA's rulemaking, there is no evidence that the State took any part in developing LODAC's attendance rules, their class notification procedures, or their policies regarding reporting conduct to parole officers.  Whereas UNLV had agreed in advance to abide by the NCAA's rules, there is no evidence that the Department and LODAC had an analogous agreement to arrest every student accused of a parole violation.  And while the NCAA recommended Tarkanian's suspension, LODAC did not request that the Department seek an arrest warrant for Plaintiff.  LODAC is therefore

17

not a state actor under the reasoning in <u>Tarkanian</u>. As <u>Tarkanian</u> illustrates, that the private entity's acts were causal factors in the resulting constitutional deprivation is not sufficient to classify it as a state actor.

### 2. Public Function Test

#### (a) Standard

This Court now considers the possibility that LODAC could be a state actor under either the public function or joint participant test. Under the public function test private participants are treated as state actors when they perform functions that are " 'traditionally the exclusive prerogative of the state.' " <u>Willis</u>, 993 F.2d at 840 (quoting <u>Nat'l Broad. Co.</u>, 860 F.2d at 1026; <u>see also</u> <u>Rendell-Baker</u>, 457 U.S. at 842. Few activities fall under this category. <u>Harvey v. Harvey</u>, 949 F.2d 1127, 1131 (11th Cir. 1992) (ruling that involuntary commitment is not a public function); <u>see also</u> <u>Jackson v. Metro. Edison</u>, 419 U.S. 345 (1974) (holding that furnishing public utilities, even when heavily regulated, is not a public function); <u>Rendell-Baker</u>, 457 U.S. at 842 (providing services to maladjusted students using public funds is not a public function); <u>Rayburn</u>, 241 F.3d at 1347 (finding that foster care is not a public function). The Supreme Court has held that neither extensive government regulation nor receipt of public funds are enough to make a private party a state actor. <u>Nat'l Broadcasting Co.</u>, 860 F.2d at 1026 n.5. It is not enough that a party performs a function that serves the public, or that it engages solely in government contracts. <u>Rendell-Baker</u>, 457 U.S. at 840-41, 843.

In <u>Rendell-Baker</u>, the defendant was a nonprofit, privately operated school for

maladjusted high school students that discharged a group of teachers and a vocational counselor. The Court held that, although providing education to students who had difficulties in the traditional public education system was a public function in some sense, the school was not a state actor under § 1983. Rendell-Baker, 457 U.S. at 842. Public funds provided ninety percent of the school's operating budget. Id. at 842. Nonetheless, educating troubled students did not lie exclusively within the province of the states, so the school was not engaged in a public function.

(b) Analysis

The facts in this case present an even less compelling argument under the public function test than the facts in Rendell-Baker. Public funds provided ninety percent of the defendant's budget in Rendell-Baker, whereas LODAC presented undisputed evidence that it received no funds from the Lowndes County Juvenile Court in 2002. (Flemming Aff. ¶ 11.) In addition, just as the government has no monopoly over the education of troubled teens, neither does it have a monopoly over the provision of social services to those teens. In no way are social skills classes "the exclusive province of the states."

This fact is bolstered by undisputed facts in the record. Fewer than one percent of LODAC's "contacts" came from the Lowndes County Juvenile Court. (Flemming Aff. ¶ 10.) The majority of its referrals were from teachers, schools, counselors, concerned parents, and other courts. (Flemming Aff. ¶ 10.) In addition, LODAC has no obligation to accept referrals from the court system. (Flemming Aff. ¶ 9.) No public official has control over LODAC, its decisionmaking process, or its Board of Directors. (Flemming Aff. ¶¶ 6-8.)

The sole evidence that Plaintiff offers to support her contention that LODAC is a state actor under the public function test is Bullard's affidavit, which states that LODAC gave Plaintiff a notice stating "Attendance is mandatory. If your child has been referred by the juvenile court, any violation of the rules will be turned over to the probation officer." (Bullard Aff. ¶ 5.) As is clear from the discussion above, however, these facts, without more, are insufficient under the public function test. Plaintiff fails to establish that LODAC was engaged in an activity that is exclusively the province of the state, and LODAC therefore is not a state actor under the public function test.

### 2. Nexus / Joint Action Test

#### (a) Standard

The nexus / joint action test requires a nexus between the State and the private party's challenged action. Focus on the Family v. Pinellas Suncoast Transit Auth., 344 F.3d 1263, 1277 (11th Cir. 2003). If the State has "so far insinuated itself into a position of interdependence with [LODAC] that it was a joint participant in the enterprise," then LODAC acted under color of law. See Focus on the Family, 344 F.3d at 1278 (quotations and citations omitted). There must be a symbiotic relationship between the private party and the State, and that relationship must involve the "specific conduct of which the plaintiff complains." Id. (quoting Rayburn, 241 F.3d at 1348); see also Blum v. Yaretsky, 457 U.S. 991, 1008 (holding health care facility was not a state actor because, although it was highly regulated, none of the government regulations dictated the contested action). A generalized relationship

between the private party and the State is not sufficient, nor is mere approval or acquiescence. Rayburn, 241 F.3d at 1348; Nat'l Broadcasting Co., 860 F.2d at 1028. Requiring a close connection that involves the particular conduct underlying the claim ensures that the State is responsible for the constitutional violation. Focus on the Family, 344 F.3d at 1278.

(b) Analysis

Determining whether a nexus between the State and LODAC or Bullard exists requires this Court to identify with specificity the conduct to which Plaintiff objects. See Rayburn, 241 F.3d at 1348 (requiring that the nexus be between the specific conduct complained of and the state). If LODAC and the State acted jointly with respect to that conduct then LODAC's actions can fairly be called state action. Plaintiff objects to her arrest without probable cause and her subsequent strip search. She also complains of LODAC's failure to notify her of the second social skills class insofar as it caused her arrest and search.

Plaintiff presents no facts on summary judgment sufficient to demonstrate that the Department and LODAC or Bullard acted jointly in arresting her, searching her, or failing to notify her of the social skills class. In support of her contention that LODAC and the State acted jointly, Plaintiff points out that (1) the county court referred her to the LODAC program and (2) LODAC's policy provided that it would report any violations of their rules to participants' probation officers.

The court's referral of Plaintiff to the LODAC class demonstrates only a generalized relationship between the State and LODAC and does not involve the specific conduct that underlies the complaint, i.e., the arrest, search, and LODAC's negligent notification.

Plaintiff's second argument comes closer to meeting the joint action requirement because LODAC's report to her parole officer bears a causal relationship to her allegedly unlawful arrest. It is still, however, not sufficient. LODAC reported her failure to attend the second class, but this is different than acting jointly in obtaining the arrest warrant. Plaintiff presents no proof that LODAC or Bullard recommended or requested her arrest or search. In fact, there is no indication in the record that she was arrested when LODAC reported her failure to successfully complete the first social skills class. It is therefore impossible to find from the record before us that LODAC or Bullard, by reporting her "no-show," was acting jointly to effect Plaintiff's arrest and search.

Because there is no evidence that would support a finding that LODAC or Bullard were state actors, all claims against these defendants under 42 U.S.C. § 1983 must be dismissed.

**D. Section 1985 Claims Against LODAC and Bullard**

Conspiracies to deprive individuals of equal protection of the laws are proscribed under 42 U.S.C. § 1985(3), which is the subsection of that statute that seems to be at issue in this case.[5] 42 U.S.C.A § 1985(3) (West 2003). The elements of a cause of action under § 1985(3) are:

(1) a conspiracy, (2) for the purpose of depriving, either directly

_____

[5]Plaintiff failed to identify in her Complaint the specific subsection of § 1985 under which she brings her cause of action. (Compl. ¶ 49.)

> or indirectly, any person or class of persons of the equal
> protection of the laws, or of equal privileges and immunities
> under the laws; and (3) an act in furtherance of the conspiracy,
> (4) whereby a person is either injured in his person or property
> or deprived of any right or privilege of a citizen of the United
> States.

Trawinski v. United Techs., 313 F.3d 1295, 1299 (11th Cir. 2002) (quoting Childree v. UAP/GA AG CHEM, Inc., 92 F.3d 1140, 1146-47 (11th Cir.1996)).  The core of a conspiracy claim is the agreement between parties. Bailey v. Bd. of County Comm'rs of Alachua County, 956 F.2d 1112, 1122 (11th Cir. 1992).  Although the plaintiff does not have to produce a "smoking gun," she must produce more than a mere scintilla of evidence of the agreement. Rowe v. City of Ft. Lauderdale, 279 F.3d 1271, 1283-84 (11th Cir. 2002).

In this case, Plaintiff's only evidence of a conspiracy is that Bullard mailed a letter to Plaintiff's parole officer informing her that Plaintiff did not attend the second session of social skills classes.  (Pl.'s Resp. LODAC's Mot. Summ. J. 6.)  Subsequently, Plaintiff was arrested.  (Pl.'s Resp. to LODAC's Mot. for Summ. J. 6.) This evidence falls far short of demonstrating that Bullard and Long agreed to conspire to deprive Plaintiff of her rights. Nothing in the record connects the two acts or suggests that Bullard and Long had an agreement or an understanding that they would work together to interfere with Plaintiff's rights.

Plaintiff argues that it "is not essential that more than one individual engage in furtherance of the conspiracy."  (Pl.'s Resp. to LODAC's Mot. Summ. J. 6.)  In support of her argument, she cites Vietnamese Fishermen's Ass'n v. Knights of the KKK.  518 F. Supp.

993 (S.D. Tex. 1981).  This case is not binding authority on this Court, nor does it support the proposition for which Plaintiff cites it.  On the contrary, the district court in that case held that there was sufficient evidence to conclude that more than one individual was involved in the alleged conspiracy.  Id. at 1006 ("[I]t is clear that the named defendants have acted together and the evidence establishes that those actions have had the effect of depriving the plaintiffs of their equal protection of the laws.").

Plaintiff failed to come forward on summary judgment with evidence that would allow a jury to find that a conspiracy between the Department, Bullard, or LODAC existed.  Therefore, Plaintiff's claims under § 1985 are dismissed.

**E.  State Law Claims**

Because the Court is dismissing all the federal law claims against Defendants Commissioner Murray, the Department, LODAC, and Bullard, the only claims that remain against these parties are state law claims.  Federal claims remain, however, against Lowndes County Juvenile Services.  The Court has discretion to adjudicate the state law claims against the Department, Commissioner Murray, LODAC, and Bullard, but declines to do so for the reasons detailed below.

When a federal court has original jurisdiction in a civil action, it also has supplemental jurisdiction over state law claims that are part of the same case or controversy under Article III.  28 U.S.C.A. § 1367(a) (2006); see also Lucero v. Trosch, 121 F.3d 591, 597 (11th Cir. 1997).  A court may decline to exercise this power, however, where the state law claim

substantially predominates over the federal claims.  Id. § 1367(c)(2).  Courts must consider the values of judicial economy, convenience, fairness, and comity when deciding whether to exercise supplemental jurisdiction.  James Wm. Moore, Moore's Federal Practice: Judicial Code § 1367.2[1][a] (3d ed. 2007) (citing City of Chicago v. Int'l College of Surgeons, 522 U.S. 156, 167 (1997); see also Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 357 (1988).

The claims against Lowndes County Juvenile Services and the claims against the other Defendants are all part of the same case or controversy.  They involve the same nucleus of operative facts, i.e., the failure to notify Plaintiff of the social skills class, her arrest, the prosecution of the parole violation, and the strip search.  This Court has original federal question jurisdiction over the claims against Lowndes County Juvenile Services; it therefore has the power to exercise supplemental jurisdiction over the state law claims against the other Defendants.

The state law claims in this case, however, clearly predominate over the federal claims that remain against Lowndes County Juvenile Services.  Because Lowndes County Juvenile Services has failed to respond to the Complaint, Plaintiff must either move for a default judgment against it or dismiss it from the lawsuit entirely.  See **III.F.**, infra.  Thus, it is unlikely that Plaintiff and Lowndes County Juvenile Services will litigate any issues of liability, conduct discovery, or present disputed issues of fact to a jury for resolution in the district court.

For these reasons, retaining jurisdiction over the state law claims against the four Defendants who have made motions for summary judgment will not accomplish goals of

judicial economy.  Furthermore, no legal or factual issues with regard to the federal claims remain.  Consequently, issues of state law substantially predominate in the dispute between Plaintiff and the Department, Commissioner Murray, LODAC, and Bullard.  This Court therefore grants the Defendants' requests to decline to exercise supplemental over the state law claims in Counts Two, Four, Five, and Six.

## F. Lowndes County Juvenile Services

As a result of the disposition of these motions for summary judgment, "Lowndes County Juvenile Services" is the only party that remains in this lawsuit.  By Plaintiff's own admission, Lowndes County Juvenile Services is an arm of the state, (Compl. ¶ 10), which would appear to make it immune from suit in federal court under the Eleventh Amendment as discussed above.  Nonetheless, this party has not responded to the Complaint nor entered an appearance, and there is therefore no motion before the Court that presents the issue.

The Court has several concerns with respect to the claims against Lowndes County Juvenile Services.  The first of those concerns is whether this party was properly served. Plaintiff's Complaint alleges that Lowndes County Juvenile Services may be served through its local manager and Commissioner Murray.  (Compl. ¶ 13).  The summons was served on Richard Knight.  (Doc. 10).  It is unclear who Richard Knight is, how he is associated with Lowndes County Juvenile Services, or whether he is the proper party to serve on behalf of that office.  The Court therefore orders Plaintiff to demonstrate that serving Richard Knight effected service on Lowndes County Juvenile Services.  This showing may include an

explanation of who Richard Knight is and what his connection to Lowndes County Juvenile Services is.

The Court also is uncertain whether Lowndes County Juvenile Services is a separate entity from the Georgia Department of Juvenile Services. As discussed in section **III.A.2.**, supra, the Georgia Code describes county departments as being under control of the state agency and subject to the Board's rules and regulations. O.C.G.A. § 49-5-7(b). But see id. (calling the county departments "local public agencies"). In addition, the Department denied Plaintiff's allegation that "Lowndes County Juvenile Services is a state agency in the state of Georgia." (Compl. ¶ 10; Dep't Answer ¶ 10). Lowndes County Juvenile Services has made no appearance or response to the lawsuit, which also casts doubt on its status as an entity separate from the Department. The Court thus ORDERS Plaintiff to show that Lowndes County Juvenile Services is subject to suit independently from the Department, and that it is not simply a branch office of the Department.

Finally, Plaintiff must cross one final hurdle with respect to Lowndes County Juvenile Services: She must address what appears to be her failure to prosecute. Courts have the inherent power to dismiss cases for want of prosecution due to inaction of the parties seeking relief. Link v. Wabash R.R. Co., 370 U.S. 626, 630 (1962). This power allows courts to manage their dockets and ensure the expeditious disposition of cases. Id.

Plaintiff filed her Complaint on June 14, 2005. A Summons was served on Richard Knight on June 16, 2005. Lowndes County Juvenile Services failed to answer the Complaint within twenty days as required under Federal Rule of Civil Procedure 12(a). In over two

years, however, Plaintiff has failed to file a motion for default judgment against this party. The Court therefore orders Plaintiff to show cause why the claims against Lowndes County Juvenile Services should not be dismissed for failure to prosecute.

If Plaintiff fails to respond by October 11, 2007, the Court directs the clerk to dismiss the claims against Lowndes County Juvenile Services without further order of the Court.

## V. CONCLUSION

The Georgia Department of Juvenile Justice and Commissioner Murray's Motion for Summary Judgment (Doc. 26) is granted and Counts One, Three, Seven, and the § 1983 claim in Count Four are dismissed with prejudice. LODAC and Rhonda Bullard's Motion for Summary Judgment (Doc. 29) is granted and Counts One, Two, Seven, and the § 1983 claim in Count Four are dismissed with prejudice. Counts Two, Five, Six, and the state law claim in Count Four against the Department, Murray, LODAC and Bullard are dismissed without prejudice so that Plaintiff may pursue her state claims in state court if she so chooses.

So ordered, this 21st day of September, 2007.

*s/ Hugh Lawson*
**HUGH LAWSON, Judge**

tch